**SIGNED THIS: July 17, 2020**

_____
**Thomas L. Perkins
United States Chief Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

IN RE:

DAVID M. ADCOCK and
CATHERINE J. ADCOCK,

    Debtors.

Case No. 18-90098

BANK OF RANTOUL,

    Plaintiff,

vs.

DAVID M. ADCOCK and
CATHERINE J. ADCOCK,

    Defendants.

Adv. No. 18-9014

**OPINION**

This matter is before the Court following trial on the complaint filed by the Plaintiff, Bank of Rantoul (the "Bank"), against the Debtors, David M. Adcock and Catherine J. Adcock, seeking a determination that certain debts are nondischargeable pursuant to §523(a)(2)(B) and §523(a)(6) of the Bankruptcy Code.

**FACTUAL BACKGROUND**

The Debtors married and began farming together in 1972. They began their borrowing relationship with the Bank in 2002, working with Hubert Neal as their loan officer, and received an operating loan each year thereafter required to be paid in full annually from the sale proceeds of each year's crops. In 2007, the Debtors executed a security agreement with the Bank granting a security interest in substantially all of their farm assets, including crops, equipment and machinery, now owned and later acquired. The security agreement includes a cross-collateral provision that applies the security interest to all existing and future debts and obligations of the Debtors to the Bank.

The Debtors paid each year's operating loan in full until 2015 when they had a poor year and were not able to fully pay the operating loan, falling short by $60,000. They also had a closed-end equipment loan with the Bank on which they made interest-only payments in 2015 and again in 2016. In October 2016, the Debtors applied with the Bank for their 2017 operating loan. In 2016, Mr. Neal retired and Scott Wonderlin became the banker in charge of the Debtors' loans. As part of the 2017 loan application process, Mr. Wonderlin asked the Debtors to complete a Farm and Home Financial Statement. They submitted the signed Financial Statement on October 24, 2016, disclosing total assets of $1,533,671, including farm equipment valued at $740,500, and total liabilities of $777,899. On October 26, 2016, the 2017 loan in the amount of $431,000 was approved by the Bank, which covered the farm operating planned expenses listed on the Financial Statement, excluding an interest expense of $21,000, plus an additional $36,000 designated as Family Living expenses.

Mr. Neal was deposed prior to trial and the deposition transcript was admitted into evidence. According to his testimony, when Mr. Neal was handling the Debtors' loan accounts, he would customarily obtain each year a copy of the Debtors' tax returns and proof of insurance and would make a "farm visit" each fall to the Debtors' property to verify, item by item, all of the equipment that was the Bank's collateral. According to Mr. Neal, this was an FSA requirement that he routinely followed since the FSA was guaranteeing the Bank's loans to the Debtors for most of the years that the Debtors had loans from the Bank. (The USDA's Farm Service Agency is authorized to guarantee farm loans up to 95% against loss of principal and interest.) His practice was to send the FSA a copy of the equipment list while keeping a copy in the Debtors' loan file. It may be inferred that the equipment list would have included all

equipment and machinery owned by the Debtors at that point in time, including items financed by other lenders such as John Deere Financial. Mr. Neal stated that it was customary when an item of equipment was sold or traded that it would be deleted from the list. After he took over the loan file in 2016, Mr. Wonderlin did not make any farm visits to the Debtors' property or otherwise inspect the Bank's collateral, which the Debtors viewed as unusual in light of their prior experience with Mr. Neal.

The Debtors do not dispute that the October 24, 2016 Financial Statement does not include unsecured debts to several creditors including approximately $15,000 of Capital One credit card debt, $18,500 of debt to Decatur Earthmover Credit Union, $22,000 in Chase credit card debt, $9,000 owed to Juniper, $3,000 owed to Synchrony, $33,000 to Van Horn, an input supplier, and $51,000 to John Deere Financial, as well as approximately $160,000 in purchase money secured debt to John Deere Financial for a Combine and a Planter. On page 3 of the Financial Statement under Cash Farm Operating Expenses, the Debtors listed Planned Expenses totaling $409,000 including a $25,000 lease payment for the Combine but failed to list the annual payment for the Planter, which was $11,631.79. The debt service payment to the Bank on the equipment loan is listed separately in the amount of $61,000. The Bank makes no allegation that the Debtors were contractually prohibited from purchasing or leasing equipment financed by other lenders.

The Debtors filed their Chapter 12 bankruptcy case on February 2, 2018, listing on Schedule B farm equipment valued at $540,000, a value of approximately $200,000 less than on the earlier Financial Statement. It came to the Bank's attention from reviewing their bankruptcy schedules that the Debtors owned a 2009 John Deere Combine and the 2004 John Deere Planter but had omitted these pieces of equipment from the October 24, 2016 Financial Statement. These two items were valued at $176,000 on the bankruptcy schedules. After doing the math, the Bank contends that the farm equipment listed on the Financial Statement at $740,500 was valued in the bankruptcy papers, just 16 months later, at only $364,000.

The Bank filed Claim 19-1 in the amount of $163,206.92, representing the unpaid balance of the 2017 operating loan as of the petition date. The confirmed Chapter 12 plan treats this claim as fully secured and obligates the Debtors to pay it in full with interest at 5.5% over a term of 7 years. The equipment loan balance is evidenced by Claim 16-1 in the amount of $280,107.79. The confirmed plan bifurcates that claim into a secured portion of $187,907 and an

unsecured portion of $92,200.79. The secured portion is to be paid in full with interest at 5.5% over a term of 7 years, while only a minimal distribution is scheduled to be made on the unsecured portion.

## ANALYSIS

### Count I

Count I of the Bank's complaint seeks a determination that the unpaid balance of the 2017 operating loan and the equipment loan, allegedly "renewed" in October 2016, should be excepted from discharge under §523(a)(2)(B). The Bank contends that the October 24, 2016 Financial Statement submitted by the Debtors was materially false for failing to list all of their debts and loan payments and by overstating the value of their farm equipment, that the Debtors intended to deceive the Bank, that the Bank reasonably relied upon the financial statement when making the 2017 operating loan and renewing the equipment loan, and that if the Bank had been aware of the true facts it would not have made the 2017 operating loan or renewed the equipment loan.

To further the policy of providing a debtor a fresh start in bankruptcy, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor. *Meyer v. Rigdon,* 36 F.3d 1375 (7th Cir. 1994). With a presumption in favor of discharge in bankruptcy, the creditor bears the burden to demonstrate by a preponderance of the evidence that the exception applies. *In re Morris,* 223 F.3d 548, 552 (7th Cir. 2000).

Section 523(a)(2)(B) provides that an individual debtor is not discharged from any debt obtained by:

> (B) use of a statement in writing ---
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. §523(a)(2)(B).

To prevail on a claim under this section, the creditor must prove that the debtor made a materially false written statement about his financial condition with the intent to deceive, and that the creditor reasonably relied on the statement. *In re Cohen,* 507 F.3d 610, 613 (7th Cir.

4

2007). A financial statement is materially false if it paints a substantially untruthful picture by misrepresenting information that would ordinarily affect the decision to grant credit, or if the lender would not have made the loan "but for" the debtor's misrepresentations. *In re Morris,* 230 B.R. 352 (Bankr. N.D. Ill. 1999), *aff'd,* 223 F.3d 548 (7th Cir. 2000).

In order to prove reasonable reliance, the creditor must establish that it actually relied upon the financial statement and that its reliance was reasonable. *Mayer v. Spanel Intern. Ltd.,* 51 F.3d 670 (7th Cir. 1995). The reasonableness of a creditor's reliance should be determined on a case-by-case basis in light of the totality of the circumstances. *Matter of Bonnett,* 895 F.2d 1155 (7th Cir. 1990). In assessing whether a creditor's reliance was reasonable, the court should consider whether the creditor followed its own standard practices and the standards or customs of the creditor's industry, including what is considered a commercially reasonable investigation of the information supplied by the debtor. *In re Cohn,* 54 F.3d 1108, 1117 (3rd Cir. 1995). It is also appropriate to take into account whether the debtor and creditor had an ongoing relationship that may have affected the nature of the transaction in question. *In re Watson,* 294 B.R. 198 (10th Cir. BAP 2003).

Intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce the lender to make a loan. *In re Napier,* 205 B.R. 900, 907 (Bankr. N.D. Ill. 1997). An outright intent to deceive is not an absolute requirement, as recklessly making a false representation can satisfy the intent to deceive requirement of §523(a)(2)(B). *In re Hudgens,* 149 Fed. Appx. 480, 486 (7th Cir. 2005); *In re Grossman,* 174 B.R. 972, 984 (Bankr. N.D. Ill. 1994) (intent to deceive may be demonstrated by proving reckless indifference to or reckless disregard for the accuracy of the information in a financial statement).

While conceding that one of the John Deere loan payments and the credit card and several other unsecured debts were not disclosed on the October 24, 2016 Financial Statement, the Debtors argue that the falsity was not material given that they still had a positive net worth. They argue that if the Bank actually relied on the statement, the reliance was not reasonable given that Mr. Wonderlin failed to make a farm visit to verify and inspect the equipment and machinery that was the Bank's collateral, failed to obtain a current credit report, and failed to request proof of crop insurance or obtain an assignment of government program payments. The

5

Debtors argue that they did not have an intent to deceive the Bank, citing their long-time borrowing relationship with the Bank.

The October 24, 2016 Financial Statement was submitted by the Debtors to the Bank in support of their application for a 2017 operating loan. Mr. Wonderlin took over the Debtor's loan account in 2016 from the prior loan officer, Hubert Neal, after Neal retired in early 2016. The application for the 2017 operating loan was Mr. Wonderlin's first significant contact with the Debtors or their account. The Debtors were long-term customers of Bank of Rantoul, having obtained farm loans annually since 2002. So even though he had no personal experience with their loan history, Mr. Wonderlin had access to a loan file that documented the performance of the Debtors' farming operation and their loan history over the prior 15 years. Mr. Adcock testified that crop year 2015 was the first time that the Debtors were unable to pay the annual payments due the Bank, when they were short by about $60,000, due to significant health problems suffered by Mr. Adcock beginning with a knee replacement in February 2015 and a subsequent back injury. This testimony was not challenged by the Bank and Mr. Wonderlin did not claim that he was unaware of Mr. Adcock's health issues as of October 2016.

In its objection to confirmation of the Chapter 12 plan, the Bank recited a history of the loan payments for 2015, 2016 and 2017, the three years preceding the bankruptcy filing. According to the Bank, the shortfall on the 2015 operating loan was $68,000. In 2016, the Debtors had a better year and were able to repay the 2016 operating loan in full plus $8,000 toward the 2015 shortfall. In 2017, the Debtors were unable to fully pay their operating loan for that year, falling short by $162,119.50. Of course, the 2017 results are not relevant to the October 2016 transaction.

In addition to annual operating loans, the Debtors borrowed $302,000 from the Bank on April 2, 2014 for the purchase of equipment, to be repaid in five equal installments of $71,360.29, inclusive of principal and interest, with the first payment due April 2, 2015. In 2015 and 2016, apparently with the Bank's acquiescence, the Debtors paid only the annual interest accrued on the equipment loan, with nothing toward principal. In 2017, the Debtors paid the interest plus $23,755.16 on the principal.

The Bank alleges that the October 24, 2016 Financial Statement was materially false in that the balance sheet section failed to list substantial unsecured debts and two purchase money secured equipment loans made by John Deere Financial and the cash flow section failed to list

6

the annual payments required to be made to John Deere Financial on account of those purchase money loans. Mr. Wonderlin testified at trial that if he had known of these other debts and the associated payments, he would not have approved the 2017 operating loan. He gave no testimony about renewing the equipment loan in October 2016, which the Court deems to be an abandonment by the Bank of the theory of nondischargeability related to the alleged "renewal" of the equipment loan. Additionally, the Bank's objection to the plan asserts that the equipment loan, a closed-end term loan, was not due to mature until April 2, 2019, which the Court determines to be a judicial admission that the equipment loan was not up for renewal in October 2016.

The omitted debts are itemized on exhibit B attached to the complaint and on Plaintiff's Exhibits 8 and 9 admitted at trial. Plaintiff's Exhibit 7 admitted at trial contains copies of statements from those creditors evidencing the balance due on or about October 24, 2016. Listed are seven credit cards and three debts to John Deere Financial including the two purchase money loans and a separate unsecured debt to John Deere Financial on a "Farm Plan" line of credit. The credit card debts total approximately $50,000 and appear to be incurred for a combination of ordinary living expenses and normal farm operating expenses that were expected to be paid off on a short-term basis according to Mrs. Adcock's testimony in her deposition, a copy of which transcript was admitted as Plaintiff's Exhibit 19. There is no allegation by the Bank and no evidence that the Debtors used the credit cards for luxury or non-ordinary purposes.

Plaintiff's exhibits 7 and 8 also evidence that the Debtors had two unsecured debts on closed-end loans with Decatur Earthmover Credit Union during the October 2016 time period with a balance of approximately $18,000. There is no evidence in the record as to when these loans were obtained or for what purpose. The records indicate that monthly payments of $500 for these loans were debited from the Debtors' credit union accounts.

Plaintiff's Exhibits 7 and 8 also evidence that the Debtors had an unsecured debt balance with John Deere Financial of $51,000 in October 2016. This debt is correlated with Claim 1-1 filed by John Deere Financial. The documents attached to that claim indicate that the Debtors maintained an open-end line of credit with John Deere Financial, called a Farm Plan account, from 2007 through 2017. The account had a basic credit limit called the "Regular Limit" of $15,000 and a second limit called the "Special Terms Limit" of $36,700 for a total credit limit of $51,700. The documents indicate that advances drawn under the Special Terms provisions were

7

payable in full on a short-term basis. The account statements showing all transactions made from 2007 through 2107 are attached to Claim 1-1. The records indicate that the Debtors used the account regularly to pay for equipment repairs and parts with Heath's in Monticello and later AHW in Monticello and to purchase seed from Monsanto. As such, these expenditures protected the value of the equipment and facilitated planting crops that were the Bank's collateral and would not have been objectionable to the Bank.

On October 20, 2016, just prior to the date of the Financial Statement, the account balance on the Farm Plan line of credit was $51,151.64. One month later, on November 20, 2016, the Debtors made payments of $38,879.78 bringing the account balance down to $14,125.70, thereby paying off in full the Special Terms advances. The records indicate that the Farm Plan account was used exclusively for ordinary farm operating expenses. Under these circumstances, it seems certain that the Bank, through Mr. Neal, would have been aware that the Debtors had such a line of credit, common in the farming industry for farmers who own substantial equipment and machinery. However, Mr. Neal did not testify at trial nor was he asked about this at his deposition. Neither was the Debtors' loan file with Bank of Rantoul introduced into evidence at trial and Mr. Wonderlin did not testify about what information that file contained.

Plaintiff's Exhibit 7 also evidences that the Debtors were indebted to Van Horn, Inc. in the fall of 2016. Van Horn is an independent agricultural services dealership located in Central Illinois providing fertilizers, seed, crop protection, consultation and custom application services to farmers. In October and November 2016, the Debtors purchased goods and services from Van Horn totaling approximately $36,000, payable in full by January 20, 2017.

The Debtors also had an open account with Illini FS for the purchase of fuel and lubricants. According to the documents that are part of Plaintiff's Exhibit 7, the Debtors made purchases in October 2016 totaling approximately $8,000, due and payable by November 25, 2016. This debt appears to be a necessary operating expense, payable on a short-term basis that was paid in full. Claim 21-1 filed by Illini FS is for a debt of $17,423 incurred in October and November of 2017 with no amounts carried over from prior years, indicating the Debtors were purchasing fuel from Illini FS each fall and regularly paying the full balance in a short time frame.

The Debtors also had two secured purchase money debts correlated with Claims 2-2 and 3-2 filed by John Deere Financial. In January 2013, Mr. Adcock purchased from Heath's a used John Deere 9670 STS Combine for $168,806, with a down payment of $25,000, and the balance of $143,921 payable with interest at 4.25% in six annual payments of $27,704.68 with the first payment due February 1, 2014. Claim 2-2 asserts a petition date balance of $82,388.45.

In December 2015, Mr. Adcock purchased from AHW a used John Deere 1790 Planter for $71,839. He made a cash down payment of $3,000 and traded in a 2000 John Deere 1535 receiving a trade-in credit of $14,900. The balance of $54,184 with interest at 3.65% was to be paid with a single payment of $2,000 due March 18, 2016 followed by five annual payments of $11,631.79 beginning on December 18, 2016. Claim 3-2 asserts a petition date balance of $45,543.01.

The evidence also indicated that Mr. Neal had not customarily required the Debtors to submit an annual financial statement. When Mr. Wonderlin took over as the loan officer handling their accounts and requested they prepare and sign a financial statement in October 2016, it was the first one they had prepared in a number of years. The Debtors did not have the benefit of using a recently prepared financial statement that could be easily updated. The October 24, 2016 Financial Statement was prepared from scratch, meaning that, Mrs. Adcock, as the farm operation's bookkeeper, must have searched through her accounting records for the information necessary to complete the statement. There is no evidence that she sought the assistance of her tax accountant.

Mrs. Adcock testified that she, not her husband, has been keeping the books and paying the bills for the farming business. She provided the list of debts requested by the Bank and provided the information listed on bankruptcy schedules D and E/F. She curated the documents in Plaintiff's Exhibit 7. She also provided the information contained in Plaintiff's Exhibit 11, which lists payments made from the USDA program payment in the amount of $30,131 received on November 24, 2016. She also provided the information contained in Plaintiff's Exhibits 13 and 14, which list 2016 expenses paid out of 2016 grain checks and which were also prepared at Mr. Wonderlin's request. Mrs. Adcock testified that all of the grain checks are two-party checks payable to the Debtors and Bank of Rantoul. Her customary procedure was to endorse the checks and send them to the Bank with directions as to how the funds were to be applied. She testified during her deposition that, with Mr. Neal's consent, they had always been allowed to pay certain

operating expenses such as hail insurance and crop insurance premiums from the grain check proceeds.

The record does not contain any evidence as to what specific role Mrs. Adcock or Mr. Adcock played in preparing the October 24, 2016 Financial Statement or what their thought process was with respect to what debts were listed and what debts were omitted or whether they understood that all debts and debt payments were to be listed. From the evidence that is in the record, however, the Court may infer that it was Mrs. Adcock who played the major role in the Financial Statement's preparation, with Mr. Adcock's input focusing on listing and valuing the items of equipment and machinery. As the Debtors point out, the larger secured debt payment to John Deere Financial for the combine was included in the cash flow section, while the smaller payment of $11,000 for the planter was omitted.

The Court carefully listened to and observed the Debtors during their testimony at trial. Both were forthright and this Court viewed their testimony as credible. Having said that, Mr. Adcock was not very knowledgeable about the financial details of the farm business as Mrs. Adcock had full responsibility for paying the bills and dealing with the Bank and the other creditors. The poor year in 2015 certainly put the Debtors in a difficult financial situation from that point forward, as they had difficulty matching the debt payment cycles with an uneven revenue stream, resulting in the use of credit cards to fill in the gaps and to cover losses.

The Court concludes that the evidence does not establish that the Debtors were intending to mislead the Bank by omitting some of their debts and one secured debt payment on the Financial Statement. They did, however, act recklessly. When, where and under what circumstances the Debtors filled out the Financial Statement is not part of the record. With no evidence to the contrary, the Court must infer that the Debtors were aware that they were required to list all of their debts on the Financial Statement, that they had sufficient time to do so, that they had ready access to their accounting records and that they were not given any contrary verbal instructions by an officer or employee of Bank of Rantoul.

With respect to whether the omissions on the Financial Statement were material, the Court concludes that they were not material to the Bank's decision to approve the Debtor's application for a 2017 operating loan. The Debtors were long-term customers of the Bank with a good repayment history. 2015 had been the first year that the Debtors were unable to fully repay what was due, which was attributable to Mr. Adcock's health issues suffered that year, which the

Bank must have been made aware of during Mr. Neal's farm visit, if not earlier. From Mr. Wonderlin's perspective, 2015 was an aberrant year. There was no reason for him to believe that the Debtors' farming operation would not return to profitability. He gave no testimony to the contrary.

The omitted debts were largely for ordinary farm operating expenses, the payment of which the Bank would have routinely approved. With respect to the omitted equipment loan payment to John Deere Financial, the Bank should have been well aware that it is necessary for farmers to regularly trade and/or replace older or unrepairable machinery and equipment. Had the omitted $11,000 payment to John Deere Financial for the planter, a necessary piece of equipment, been listed, it would not have been a red flag to the Bank and would not have been a significant concern regarding the Debtor's ability to repay the Bank's loans as the cash flow portion of the Financial Statement projected sufficient net income to cover the payment.

It should be emphasized that while Mr. Wonderlin was new to the Debtors' loan accounts and lacked the personal historical knowledge that Mr. Neal had, he is nonetheless properly charged with knowledge of all of the information contained in the Bank's loan files for the Debtors' accounts. According to Mr. Neal's testimony, the loan files would have included a complete list of all of the Debtors' machinery and equipment for most, if not all, of the years that the Debtors were doing business with the Bank. Given that Mr. Neal was making an annual farm visit, it is highly likely that he was aware of the Debtors' equipment purchases with John Deere Financial and that the Bank's loan files would have contained such information.

Testifying at trial, Mr. Wonderlin made a conclusory, and convenient, declaration that he would not have approved the 2017 operating loan had the Debtors fully disclosed all of their debts. Here again, it is significant that the Debtors were long-term customers of the Bank with a good repayment record, unlikely to have their annual access to an operating loan cut off absent extreme circumstances. Most importantly, grain farm operating loans are written as fully secured loans, expected to be repaid in full from the sale proceeds of that year's crops, usually backstopped by crop insurance. The 2017 operating loan was made as a fully secured loan. There is no evidence that the Bank believed Mr. Adcock's crop yield and price projections were overly optimistic.

Mr. Wonderlin's assertion that he would have denied the application for the 2017 operating loan was not corroborated by any other evidence. There was no evidence that in

11

October 2016 the Bank had classified the Debtors' loans as distressed or troubled, or that the Bank's loan committee or Board was questioning whether the Bank should continue to provide credit to the Debtors. In fact, the 2016 operating loan had been approved notwithstanding the arrearage on the 2015 loan. The Bank did not obtain a credit report or engage in other activity that could be characterized as due diligence. Moreover, a decision by the Bank not to fund the Debtors' input expenses, possibly resulting in no crops planted and no crop income, would have dramatically increased the payment risk for the Bank's equipment loan and other loans. Given the Debtors' large equipment loan with the Bank, it would have been a risky decision for the Bank to turn down the 2017 operating loan thereby forcing the Debtors to attempt to find input financing elsewhere. There are no facts in the record to indicate that the Bank was prepared to assume that risk in October 2016. In fact, the promissory note evidencing the 2017 operating loan is dated October 26, 2016, just two days after the date of the Financial Statement, indicating prompt approval of the loan. The Court concludes that it is more likely than not the Bank would have made the 2017 operating loan even if the additional unsecured debts and the planter payment had been listed on the Financial Statement.

With respect to the Bank's allegation that the equipment values on the Financial Statement may have been inflated, pages 7 and 8 of the Financial Statement are a typed list of equipment entitled "Machine Inventory" with a handwritten value amount next to each item. The only "evidence" offered as proof of the allegation is the lower aggregate value sum stated in the bankruptcy schedules. Mr. Wonderlin admitted that the Bank had not had the Debtors' equipment appraised after he assumed responsibility for the loans. None of the prior years' equipment lists were produced for purposes of comparison. The Debtors were asked no questions about who prepared the typed "Machine Inventory" or how the values were determined. Whether the values on the Financial Statement were based on replacement value versus liquidation value on the bankruptcy schedules is not part of the record, but that is a reasonable inference based upon the circumstances. The Court concludes that the Bank failed to carry its burden to prove the Debtors intentionally overstated the value of their equipment on the Financial Statement in an effort to mislead the Bank.

The Court concludes that the Bank failed to prove that the omissions and misstatements on the October 24, 2016 Financial Statement were material, a necessary element of proof under §523(a)(2)(B). Judgment will be entered for the Debtors on Count I.

**Count II**

In Count II of the complaint, the Bank alleges that the Debtors disposed of assets that were its collateral without paying the proceeds to the Bank, seeking a determination of nondischargeability in an amount equal to the value of the assets converted under §523(a)(6). The Bank alleges that the Debtors wrongfully converted a John Deere 8430 tractor, certain grain proceeds and government program payments.

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. §523(a)(6). A security interest in or a lien on property of the debtor is a property interest held by the secured creditor so that an act of conversion of a creditor's collateral may be within the scope of §523(a)(6). Willfulness is established by proof that the debtor, without the creditor's authorization, sold or otherwise disposed of the creditor's collateral and used the proceeds for purposes other than payment of the secured debt. *In re Foust,* 52 F.3d 766 (8th Cir. 1995); *In re Russell,* 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001). Maliciousness is established where the debtor either intended to harm the secured creditor or was aware that it was "highly likely" the creditor would be harmed by his actions. *Jendusa-Nicolai v. Larsen,* 677 F.3d 320, 324 (7th Cir. 2012); *see also In re Scarlata,* 979 F.2d 521, 526 (7th Cir. 1992) (creditor must show that the debtor knew his acts would automatically or necessarily cause the creditor's injury).

The inquiry into maliciousness also asks whether the debtor was aware that he had no legal justification for his actions or whether he believed he had a just cause or excuse. *Jendusa-Nicolai,* 677 F.3d at 324; *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994). A just cause or excuse may be demonstrated where the debtor and creditor had an established course of dealing whereby the creditor permitted the debtor to sell or dispose of collateral without necessarily having to pay the proceeds to the creditor. *In re Wolfson,* 56 F.3d 52, 54-55 (11th Cir. 1995); *In re Magee,* 164 B.R. 530, 536 (Bankr. S.D. Miss. 1994). Such a permissive course of dealing is common in the agricultural lending arena when a lender holds a security interest in all or most of the farmer's personal property assets such as crops, government program payments, equipment and machinery, and all proceeds, a so-called "barnyard lien," and by necessity permits the proceeds of its collateral, often the farmer's sole income, to be used to pay ordinary operating expenses and living expenses. *See In re Adkisson,* 2001 WL 34076353 (Bankr. C.D. Ill.).

13

According to the evidence presented at trial, the Debtors and the Bank had an established course of dealing under which the Debtors deposited all grain checks (which were two-party checks) into their account at the Bank. Mrs. Adcock would then direct the Bank how to apply the funds among their several Bank loans or to pay other non-Bank debts, which the Bank willingly permitted. The Bank also did not regularly take an assignment of government program payments. The Court concludes that, in general, the Bank freely permitted the Debtors to use the grain and government program proceeds as they saw fit, at least to the extent that the Debtors remained current on their annual loan payments to the Bank. The Bank never required the Debtors to pay any additional income or profits other than the regular payments due on their loans. Although the Bank could have altered the established course of dealing after the payment shortfall in 2015 by notifying the Debtors of a change, there was no evidence presented that any alteration was ever communicated by the Bank.

There was a somewhat different course of dealing with respect to machinery and equipment. According to Mr. Neal's deposition testimony, he followed a relatively strict regimen requiring an annual inspection and listing of the machinery and equipment, at least in part because it was an FSA requirement. With any loan secured by depreciating collateral, the lender's goal is to maintain a fully secured position at all times. Mr. Neal acknowledged that farmers regularly trade older equipment for newer equipment without much concern by the secured lender, presumably as long as the aggregate collateral value is maintained. If, however, the Debtors had sold a piece of equipment without replacing it, Mr. Neal stated that he would expect them to pay the sale proceeds to the Bank, although there is no evidence in the record that this ever happened.

The Debtors owned a John Deere 8430 Tractor purchased in 2011 and financed by John Deere Financial. On June 1, 2017, the Debtors sold the Tractor to First Farmers Bank and Trust of Converse, Indiana as a sale and lease-back transaction. The transaction is described in paragraph 18 of the Statement of Financial Affairs and on Form 4797 of the Debtors' 2017 federal income tax return. The sale price was $130,000, from which $36,291.46 was paid to the first lienholder, John Deere Financial, and $25,148.49 was paid to First Farmers, as lessor, for the first lease payment. The remaining sale funds of $68,560.05 were not paid to Bank of Rantoul even though the Bank held a junior lien on the Tractor. The disposition of those funds

was not explained by the Debtors. The Bank alleges the Debtors' failure to pay the remaining proceeds to the Bank caused it to suffer a willful and malicious injury.

The rationale for the sale and lease-back transaction was not explained by the Debtors at trial. The only reasonable inference to be drawn from the evidence is that the transaction enabled the Debtors to pay off the purchase money loan balance to John Deere Financial and receive about 70% of the remaining equity value of the 8430 tractor in cash from First Farmers Bank. The Debtors did not seek the approval of or make Bank of Rantoul, holder of a junior lien, aware of the transaction involving a piece of its collateral. The Debtors reportedly received a cash payment of $68,560.05, no portion of which was paid to Bank of Rantoul. Since there was no additional equipment added to the Debtors' equipment inventory as a consequence of the transaction, the aggregate value of the Bank's collateral declined, constituting an injury to the Bank's property interest.[1] At trial, the Debtors made no effort to explain why they engaged in the transaction in June 2017, or how the proceeds were spent. At that point in time, the Debtors had already missed two principal payments on the equipment loan and were carrying an unpaid balance on the 2015 operating loan. Under these circumstances, the Court concludes that the Debtors actions were willful and malicious toward the Bank under §523(a)(6).

The Bank also had a lien on proceeds from the sale of Debtors' grain. Farm borrowers are customarily required to sell their grain to designated purchasers who are made aware of the lender's lien and, consequently, grain checks are issued as two-party checks, with the farmer and the lender as joint payees. Mrs. Adcock testified that her usual procedure when she received a grain check was to endorse it and mail it to the Bank for deposit into the Debtors' checking account. She would often send a separate check drawn on that checking account to pay the Bank on one of the loans. She stated they used a separate check for tax reasons. In 2016, the Debtors spent $43,724.31 from the checking account that held the grain proceeds on things such as labor, crop insurance, and repairs. In 2017 Debtors spent $50,517.86 from the checking account on things such as parts, fuel, and labor. Mr. Wonderlin stated the Bank allowed these checks to clear

---

[1] Oddly, the tax documents indicate that the 8430 Tractor was purchased in 2011 for $110,000 and sold in 2017 for $130,000. Presumably, the 2017 sale price was inflated above the true value to enable the Debtors to obtain a larger cash payment from First Farmers Bank, which that bank was willing to go along with likely in exchange for a more favorable return on its investment. In 2017, the Debtors incurred a net farm loss of $86,000, offsetting the $96,000 taxable gain on the sale and lease-back transaction, meaning the inflated sale price did not result in a significant tax liability. Under these circumstances, the appropriate loss determination for §523(a)(6) purposes is $68,560.05, the amount of cash the Debtors actually received from the transaction.

15

because they believed more money would come in from the sale of grain. The Bank takes the position for purposes of its complaint that the Debtors acted wrongfully in using the grain proceeds to pay other debts and that the proceeds should have been applied towards the Debtors' loans with the Bank.

All of the grain checks were two-party checks that named the Bank as a joint payee and were deposited in the Debtors' account at the Bank. The payments from that account were all known to and at least tacitly approved by the Bank and appear to have been for necessary farm expenses or living expenses, consistent with the established course of dealing between the parties. There is no allegation that the Debtors sold grain out of trust or made any misrepresentation about the use of the grain proceeds. The Court concludes that the Debtors' use of the grain proceeds to pay other debts and expenses was consistent with the established course of dealing, was at least implicitly consented to by the Bank and was not malicious.

The Bank also had a lien on government payments. The Debtors received a USDA Conservation Stewardship Program payment of $30,131 deposited into their account at the Bank on November 24, 2017 and an additional subsidy payment of $24,000 received in the Fall of 2017. None of those funds were applied to the Debtors' loans with the Bank. Here again, the Bank permitted the Debtors to use those funds in their discretion by writing checks on the account.

After the bankruptcy filing, at the Bank's request, Mrs. Adcock compiled lists of the expenses paid out of those government payments. The $30,131 from the Conservation Stewardship Program was used to pay ordinary expenses such as labor, parts, insurance premiums, electricity and phone bills, groceries and household expenses. From those funds, they also made a $10,000 payment to their bankruptcy attorney on January 3, 2018. Similarly, the $24,000 subsidy money was used to pay for parts for the machinery, drainage tile, utilities, insurance and gasoline for the farm tank.

The course of dealing established by the evidence shows that the Bank had never taken an assignment of any government program payments. The Bank was not a payee on the checks and had never mandated that the Debtors were required to apply government program funds to their loans with the Bank. Instead, the Bank allowed the Debtors to use the funds to pay ordinary operating and living expenses at their discretion. The record indicates that the Debtors, with Mr. Neal's knowledge and consent, regularly used government payments received in the fall to pay

16

insurance premiums, likely in recognition of the fact that cash flow is a common issue as many farm expenses come due before grain is harvested and sold. The Bank could have at any time revoked their permission for the Debtors to use the government program funds to pay other expenses, but it did not do so.

The Debtors were not examined at trial about the timing of the payments or about what their revenue expectations were at that time. Missing from the record is any evidence that the Debtors spent the government payments knowing that they would be unable to pay the full 2017 loan payments to the Bank. With one exception, the Bank did not carry its burden to prove that the government program proceeds were spent maliciously. The exception is the retainer fee paid to the bankruptcy lawyer, which was not an ordinary operating or living expense within the scope of the established course of dealing. The Debtors could not have had a reasonable expectation that the Bank would have approved of the use of its collateral for that purpose.

The Court concludes that under §523(a)(6), the Bank suffered a loss due to willful and malicious conversion of its collateral in the amount of $78,560.05. The Bank is entitled to a judgment of nondischargeability on Count II in that amount.

This Opinion constitutes this Court's findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure. A separate judgment order will be entered.

# # #